JOSEPH P. BUSCH III, SBN 70340
jbusch@apjuris.com
CHRISTOPHER L. PITET, SBN 196861
cpitet@apjuris.com
JOHN M. ALPAY, SBN 198127
jalpay@apjuris.com
**ADKISSON PITET LLP**
100 Bayview Circle, Suite 210
Newport Beach, California 92660
Telephone: (949) 502-7755
Facsimile: (949) 502-7762

ERIC D. RIDLEY, SBN 273702
ridley.eric@gmail.com
**LAW OFFICE OF ERIC RIDLEY**
567 W. Channel Islands Blvd., Suite 210
Port Hueneme, CA 93041
Telephone: (805) 244-5291
Facsimile: (888) 953-3884

Attorneys for Plaintiff
GOATPIX LLC

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOATPIX LLC, a Nevada limited liability company,<br><br>             Plaintiff,<br><br>   v.<br><br>THE UPPER DECK COMPANY, a Nevada corporation authorized to do business in California; and DOES 1 through 10, inclusive,<br><br>             Defendants. | CASE NO. 3:21-cv-01815-TWR-JLB<br><br>Hon. Todd W. Robinson<br><br>**FIRST AMENDED COMPLAINT OF PLAINTIFF GOATPIX LLC FOR COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: October 25, 2021<br>Trial Date:  None Set |

Adkisson Pitet
LLP

Plaintiff GOATPIX LLC ("Goatpix") for its First Amended Complaint ("FAC") against Defendant THE UPPER DECK COMPANY ("UDC") and DOES 1 through 10 (collectively, "Defendants") hereby alleges as follows:

## I.

### JURISDICTION AND VENUE

1.   This is an action for copyright infringement arising under 17 U.S.C. § 501.

2.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), & 1367(a).

3.   This Court has personal jurisdiction over Defendants by virtue of each Defendant's systematic and continuous contacts with California and by the actions in California giving rise to this FAC, including in this Judicial District.

4.   Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## II.

### THE PARTIES

5.   Plaintiff Goatpix is, and at all relevant times herein was, a Nevada limited liability company with its principal place of business in Brea, California.

6.   Plaintiff Goatpix is informed and believes, and based thereon alleges, that Defendant UDC is, and at all times material to this action was, a Nevada corporation, qualified to do business in California, with its principal place of business in Carlsbad, California.

/ / /

/ / /

Adkisson Pitet
LLP

# III.

## BACKGROUND

**A.   Plaintiff Goatpix and Its Copyrights**

7.   Goatpix owns all rights and interest in a significant number of priceless photographs of NBA players, teams and events.

8.   The images were created by photographer Bill Smith.

9.   Bill Smith executed a valid agreement (the "Smith Agreement") between himself and the Chicago Bulls, which confirmed his rights to the works that he created. The Smith Agreement provides, in relevant part:

> Photographer retains all rights to use and permit others to use the Prior Work in any fashion, including selling images that are part of the Prior Work . . . .

10.  A true and correct (redacted) copy of the Smith Agreement between Bill Smith and the Chicago Bulls is attached hereto as Exhibit "A."

11.  Dwight Manley, Inc. ("DMI") purchased the rights to these images directly from Bill Smith, who was the team photographer for the Chicago Bulls NBA team for a number of years.  A true and correct (redacted) copy of the purchase agreement between DMI and Bill Smith is attached hereto as Exhibit "B."

12.  DMI subsequently assigned the rights to the images to Goatpix.  A true and correct copy of the assignment agreement assigning the rights to the images is attached hereto as Exhibit "C."

13.  The crown jewel of the collection that DMI purchased from Bill Smith (and which DMI subsequently assigned to Goatpix) is the most iconic sports image ever captured.  It is an image of NBA

Adkisson Pitet
LLP

superstar Michael Jordan, mid-air, during a spectacular moment in the 1988 All Star NBA Slam Dunk Contest ("mj_1002").

14.    A true and correct copy of mj_1002 is attached hereto as Exhibit "D."

15.   Goatpix has filed for, and received, copyright protection for mj_1002.  A true and correct copy of the copyright registration for mj_1002 is attached hereto as Exhibit "E."

16.   Goatpix therefore owns the copyrights in and to this work (the "Goatpix Copyrighted Work").

17.   Under the Copyright Act, Goatpix has the exclusive right, inter alia, to reproduce the Goatpix Copyrighted Work, to distribute copies of the Goatpix Copyrighted Work, to display copies of the Goatpix Copyrighted Work, to create products using the Goatpix Copyrighted Work, and to authorize or license any such activities in all markets, worldwide.

18.   Goatpix has invested, and continues to invest, substantial sums of money, time, effort, and creative talent to exploit its rights and interest in the Goatpix Copyrighted Work.

19.   Goatpix has aggressively enforced its rights under copyright law and has taken down hundreds of infringing products from the internet, each of which were infringing on the Goatpix Copyrighted Work.

20.   Theft of copyrighted material on the Internet has reached epidemic proportions, and theft is even more pernicious in the sports memorabilia sector, due to the giant margins available by selling stolen product.

21.   Infringing websites and products such as those operated and created by Defendants exploit material that Goatpix has spent

Adkisson Pitet
LLP

substantial sums of money to obtain.  The Goatpix Copyrighted Work,
as of the original complaint of this action, was being used by
Defendants, offered as their own exclusive work, and sold for
significant amounts of money.

22.  As a result, Goatpix has been deprived of revenue and
market share for this iconic image, the market for future sales of
this image has been irreparably diluted, and Defendants have
enriched themselves on the back of Goatpix' intellectual property.

23.  Unfortunately, Defendants' disregard for the sanctity of
copyright law has left Goatpix no choice but to bring this action.

**B.   Defendants' Wrongful Acts**

24.  Defendants, and each of them, created physical and
electronic products which directly infringed mj_1002.  Defendants
then downloaded, hosted and provided the infringing images and
products on infringing websites operated in, or available to,
residents of California.  Defendants also sold physical memorabilia
using mj_1002, online and through their vast network of resellers.

25.  Exhibit "F," attached hereto, is a true and correct copy
of screenshots taken from Defendant's website on August 04, 2021,
more than a month after Defendants had received multiple notices of
their infringements.

26.  Exhibit "G," attached hereto, is a true and correct copy
of communication between Eric Ridley (counsel for Goatpix), Dwight
Manley (the managing member of Goatpix), and UDC, regarding the
infringing images and products.  It is clear from these
communications that Plaintiff asked, respectfully and repeatedly,
for UDC to produce evidence of a license for the mj_1002 image.
UDC had ample time to respond, to stop sales, and to recall their

product.  Instead, UDC chose to engage outside counsel, who in turn sent Goatpix a belligerent communication which doubled down on their refusal to provide evidence of a license, while simultaneously, and without a scintilla of evidence, claiming to have "an exclusive right to sell Michael Jordan paraphernalia."

27.  Defendants used the worldwide web, including hubs located in California, as well as their vast network of thousands of retailers, to sell their infringing products that used Goatpix's copyrighted images and to transmit the infringing Goatpix materials and products to users in California, nationwide, and worldwide, including in this judicial district, who downloaded such materials onto their computers, or who had the infringing products shipped to them.

28.  Defendants had actual knowledge that they were storing and displaying specific Goatpix Copyrighted Work.

29.  Defendants had actual knowledge that they were infringing Goatpix's copyright.

30.  On information and belief, Defendants never had, at any relevant time, a license to use the image mj_1002, instead choosing to simply steal this image and claim it as their own.

31.  The works created, stored, and displayed by Defendants were identical reproductions of the Goatpix Copyrighted Work, excepting the manipulations and cropping engaged in by the Defendants, and each of them.

32.  Defendants, and each of them, have ridden on and exploited Goatpix's coattails and hard-earned credibility for their own pecuniary gain, all to the detriment of Goatpix.

Adkisson Pitet
LLP

33.   In every relevant action they took, Defendants acted with a consciousness of guilt.

34.   Defendants' conduct has caused, and continues to cause, severe and irreparable harm to Goatpix.

**IV.**

**FIRST CLAIM FOR RELIEF**

**Copyright Infringement under 17 U.S.C. §501**

**Against Defendant Upper Deck Company**

35.   Goatpix hereby repeats, realleges, and incorporates by reference paragraphs 1 through 34 of this FAC as though fully set forth herein.

36.   This is a claim for copyright infringement in violation of 17 U.S.C. § 501.

37.   Goatpix is the owner of the copyrights in the Goatpix Copyrighted Work, which contain copyrightable subject matter under 17 U.S.C. §§ 101 *et seq.*

38.   Goatpix has complied in all respects with 17 U.S.C. §§ 102 et seq., the statutory deposit and registration requirements thereof, and all of the laws governing federal copyrights, to secure the exclusive rights and privileges in and to the Goatpix Copyrighted Work.

39.   Goatpix is informed and believes, and on that basis alleges, that Defendants have willfully and deliberately infringed on Goatpix's copyrights in the Goatpix Copyrighted Work by copying and distributing same.

40.   Goatpix is informed and believes, and on that basis alleges, that Defendants have made profits and have been unjustly

enriched by reason of their infringement of the Goatpix Copyrighted Work.

41.  As a direct consequence of Defendants' aforementioned acts, Goatpix has been damaged in an amount to be determined through discovery.

42.  As a direct consequence of Defendants' aforementioned acts, Goatpix's ability to generate revenue by licensing the Goatpix Copyrighted Work has been greatly impaired.

43.  As a direct consequence of Defendants' aforementioned acts, Goatpix's reputation has been damaged.

44.  As a direct consequence of Defendants' aforementioned acts, Goatpix has suffered, and will continue to suffer, irreparable injury.  Such damage and irreparable injury will continue and will increase unless and until Defendants are enjoined from their wrongful acts.

**V.**

**DEMAND FOR JUDGMENT**

WHEREFORE, Goatpix demands judgment against Defendants as follows:

1.  That the Court enter judgment in favor of Goatpix and against Defendants on all claims for relief alleged herein;

2.  That the Court enter judgment that Defendants have willfully violated the provisions of 17 U.S.C. § 501;

3.  That Defendants, their officers, agents, servants, employees, attorneys, successors, and assigns, and all other persons in active concert or participation with any of them who receive actual notice of the injunction by personal service or otherwise, be forthwith preliminarily and permanently enjoined from

Adkisson Pitet
LLP

using Goatpix's copyrights in any manner without authorization from Goatpix;

4.   That the Defendants be required to impound all infringing copies of Goatpix's work that are in Defendants' possession or under its control, pursuant to 17 USC Sections 503 and 509(a).

5.   That Defendants be required to account to Goatpix for any and all profits derived by Defendants and all damages sustained by Goatpix by virtue of Defendants' acts complained of herein;

6.   That Defendants be held liable and ordered to pay over to Goatpix all damages that Goatpix has sustained, including statutory damages to the extent permitted by law, as a consequence of the acts complained of herein, subject to proof at trial, and that Goatpix be awarded the profits of Defendants derived by reason of said acts, all as determined by said accounting for;

7.   That Goatpix recover its costs and expenses, including attorneys' fees to the extent recoverable at law, of this action from Defendants pursuant to 17 U.S.C. § 505; and

8.   That Goatpix be awarded such other and further relief as this Court may deem just and proper.

Dated:   December 9, 2021          JOSEPH P. BUSCH III
                                   CHRISTOPHER L. PITET
                                   JOHN M. ALPAY
                                   **ADKISSON PITET LLP**

                                   ERIC D. RIDLEY
                                   **LAW OFFICE OF ERIC RIDLEY**


                                   By:___/s/ *Christopher L. Pitet*___
                                          Christopher L. Pitet

                                   Attorneys for Plaintiff
                                   GOATPIX LLC

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff Goatpix LLC hereby demands a trial by jury on all

3

issues triable by a jury as provided by Rule 38(a) of the Federal

4

Rules of Civil Procedure.

5

6

Dated:  December 9, 2021          JOSEPH P. BUSCH III
                                  CHRISTOPHER L. PITET

7

                                  JOHN M. ALPAY
                                  **ADKISSON PITET LLP**

8

                                  ERIC D. RIDLEY

9

                                  **LAW OFFICE OF ERIC RIDLEY**

10

11

                                  By:_____*/s/ Christopher L. Pitet*_____

12

                                        Christopher L. Pitet

13

                                  Attorneys for Plaintiff
                                  GOATPIX LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Adkisson Pitet
LLP

EXHIBIT A

# CHICAGO BULLS

*Six-Time World Champions*  91 • 92 • 93 • 96 • 97 • 98

July 1, 2005

Mr. Bill Smith
Bill Smith Photography
360 West Illinois Street
Suite 616
Chicago, IL 60610

Dear Bill:

We (the "**Bulls**") are pleased to continue to engage you and your venture, Bill Smith Photography (collectively referred to herein as "**Photographer**"), as our team photographer under the following terms and conditions:

    1.    <u>Services and Term</u>.

        (a)    <u>Engagement</u>.  The Bulls hereby engage Photographer, and Photographer hereby accepts such engagement, to serve as the Bulls' team photographer and provide services for the Bulls pursuant to the terms of this letter agreement.

        (b)    <u>Scope of Duties and Services</u>.  Each Term Year (as defined below), Photographer shall (i) shoot pictures (collectively, "**Game Photographs**") at each Bulls' pre-season, regular season and post-season home game occurring during such Term Year (each, a "**Home Game**") (including pictures of game action and pre- and post-game and half-time activities) consistent with past practice, (ii) shoot pictures at ten (10) non-game related photo shoots (including, but not limited to, front office head photos, press conferences, clinics, auctions and at home photos with Bulls' players) as directed by the Bulls consistent with past practice (collectively, "**Non-Game Photographs**"), (iii) shoot team photos and pictures to be used for LuvaBulls' posters as directed by the Bulls consistent with past practice (collectively, "**Additional Photographs**," and collectively with the Game Photographs and the Non-Game Photographs, the "**Photographs**"), and (iv) use his reasonable efforts to make himself available to shoot Non-Game Photographs at additional non-game related photo shoots in excess of ten (10) as requested by the Bulls (each, an "**Extra Shoot**").  The format of the Photographs shall be determined by the Bulls consistent with past practice.  Photographer agrees to report to each Home Game no later than one and one-half ($1^1/_2$) hours prior to each such Home Game.

        (c)    <u>Delivery of the Photographs</u>.  Photographer agrees to deliver to the Bulls all Game Photographs no later than twenty-four (24) hours following the conclusion of any Home Game at which such Game Photographs were taken.  Photographer and the Bulls shall mutually agree upon the date of delivery to the Bulls by Photographer of the Non-Game Photographs and the Additional Photographs on a case-by-case basis consistent with past



practice. All Photographs delivered by Photographer to the Bulls shall be delivered in a format determined by the Bulls consistent with past practice.

        (d)    Term. The term of this letter agreement shall begin on July 1, 2005 and shall end on June 30, 2006; provided that this letter agreement shall automatically renew for successive one (1) year periods (such initial one-year period and each successive one-year period shall each be referred to herein as a "**Term Year**") unless either party gives the other party written notice of such party's intention to terminate this letter agreement at least thirty (30) days prior to the expiration of the then current Term Year, and such termination shall be effective as of the end of the then current Term Year.

    2.    Fees and Expenses.

        (a)    Fee. In consideration for Photographer's performance of the services hereunder, (i) each Term Year the Bulls shall pay Photographer an aggregate fee equal to



        (b)    Invoices. For each Term Year, Photographer shall submit to the Bulls written invoices specifying the payment owed to Photographer pursuant to **Sections 2(a)** and **2(c)** and all back-up documentation substantiating expenses incurred by Photographer hereunder (including, without limitation, copies of all invoices, receipts and bills evidencing such expenses), and the Bulls shall pay such invoices on an annual or semi-annual basis consistent with past practice.

        (c)    Reimbursement of Expenses. Photographer shall be reimbursed for all reasonable out-of-pocket expenses incurred by Photographer outside of the ordinary course of business in the performance of any Extra Shoot consistent with past practice.

        (d)    Assistants. Bill Smith shall devote such time, attention, skills and efforts as may be necessary to enable Photographer to effectively perform the services hereunder. In the event Photographer needs to employ or engage assistants to aid in the provision of services hereunder, all of the terms and conditions of this letter agreement shall apply equally to Photographs taken, and services provided, by any such assistants. Photographer shall be responsible for any breach of this letter agreement arising from the work of any such assistants,

and Photographer shall ensure that all rights, title and interest in and to any Work (as defined below) created by any such assistants is vested in Photographer.  Prior to employing or engaging any assistant to aid in the provision of services hereunder, Photographer shall (i) cause such assistant to execute a Work Made For Hire Agreement with Photographer, in the form set forth as Exhibit A to this letter agreement, and (ii) provide to the Bulls a complete copy of each such executed Work Made For Hire Agreement.

      3.      <u>Ownership and License of the Work</u>.

      (a)      All photographs, transparencies, negatives, digital pictures, compact discs and other property, works of authorship and work product which Photographer (or his assistants), alone or jointly, has created, conceived, developed or reduced to practice pursuant to or in connection with his provision of photography services to or on behalf of the Bulls prior to the date hereof will collectively and individually hereinafter be referred to as the "**Prior Work**." All photographs, transparencies, negatives, digital pictures, compact discs and other property, works of authorship and work product which Photographer may, alone or jointly, in the future create, conceive, develop, or reduce to practice pursuant to or in connection with his provision of the services hereunder or any other services to or on behalf of the Bulls, will collectively and individually hereinafter be referred to as the "**Future Work**." (The Prior Work and the Future Work are referred to collectively as the "**Work**.")

      (b)      The Bulls hereby agree, as between Photographer and the Bulls, that (i) Photographer owns the copyrights in the Work, subject to the License (as defined below) and the provisions set forth in **Sections 3(d)**, **3(e)** and **4**, and (ii) at the written request of the Bulls and at the Bulls' expense, Photographer will apply to register the Work with the United States Copyright Office, which registrations shall be subject to the License and the respective rights and obligations of the parties set forth in this letter agreement.

      (c)      Photographer hereby grants the Bulls a royalty-free, irrevocable, perpetual, transferable, sublicensable license (the "**License**") to use, display, publish, copy, record, distribute, augment, subtract from, modify, distort, translate, transfer copies of, combine with other information or materials, create derivative works based on, sell copies of or otherwise exploit, for any purpose, the Work and any portion thereof, in any manner or media throughout the world, as the Bulls may in its sole discretion determine.  Any assignee, transferee, or sublicensee of the License or of the Bulls' other rights under this Agreement will not be entitled to sell, rent, or lease images or copies of the Work or any portion thereof without Photographer's prior written consent.  The License shall be non-exclusive as to the Prior Work, and shall be exclusive to the Bulls with respect to the Future Work, subject to the rights expressly retained by Photographer as described in **Section 3(d)**.  If the Bulls become aware of any facts that lead the Bulls to reasonably believe that any third party is infringing any copyrights in the Future Work ("**Infringement**"), then the Bulls shall give Photographer written notice thereof.  If Photographer, after notice from the Bulls, declines to pursue, or fails to pursue within thirty (30) days of receipt of such notice, legal action against an Infringement, then the Bulls, as an exclusive licensee of the Future Work and at its expense, shall have the right, in its own name or on Photographer's behalf, without obligation to consult with, or account to, Photographer, to prosecute (and retain and recover damages with respect to) such Infringement.   Photographer

shall reasonably cooperate with the Bulls in connection with any such prosecution.  In the event Photographer becomes aware of any Infringement, then Photographer shall give the Bulls written notice thereof promptly after becoming aware of such Infringement.  If Photographer pursues legal action against any Infringement, which shall be at Photographer's expense, Photographer will be entitled to retain all damages recovered, and the Bulls shall reasonably cooperate with Photographer in connection with any such prosecution.

(d)     Subject to **Sections 3(e) and 4**, (i) as to the Prior Work, Photographer retains all rights to use and permit others to use the Prior Work in any fashion, including selling images that are part of the Prior Work, and (ii) as to the Future Work, Photographer retains the right to sell images that are part of the Future Work to any magazine or publication consistent with Photographer's prior practice with respect to the Prior Work.  The parties acknowledge that NBA Documents will not be deemed to amend this letter agreement with respect to the ownership of the copyrights in the Work.

(e)     Nothing contained herein shall be deemed to confer upon Photographer, during the term of this letter agreement or thereafter, any rights in, or license to, any Bulls' trade names, trademarks, logos, identifications and the like, or any rights of publicity or other rights of any NBA player, all of which shall be and remain the sole property of the Bulls, the National Basketball Association ("**NBA**") and/or any such NBA player, as the case may be.

(f)     The Bulls agree to give Photographer a photo credit wherever possible in Bulls' publications in which the Photographs are used consistent with past practice.

4.     <u>Representations; Warranties and Covenants</u>.  Photographer represents, warrants and covenants to the Bulls that: (a) Photographer has the legal right and capacity to enter into this letter agreement, (b)  while Photographer continues to serve as the Bulls' team photographer under this Agreement, Photographer will comply with any and all rules and regulations promulgated by the NBA and the Constitution, By-laws and organizational agreements, rulings or orders of the NBA ("**NBA Documents**") in connection with Photographer's creation and use of the Work and the performance of the services provided hereunder, (c) Photographer will comply with all applicable laws, rules and regulations in connection with the  performance of the services provided hereunder, (d) none of the Works created by Photographer or any person employed or retained by Photographer will infringe the copyright or other rights of any other person or entity, (e) other than the License and as permitted under **Section 3(d)** or **9**, neither Photographer nor any other person employed or retained by Photographer has granted or will grant any license or other rights to the Works to any other person or entity and no other person or entity has any such rights, and (f) Photographer agrees to perform the services hereunder in a professional manner and in accordance with the highest standards of the professional sports photography industry (including, without limitation, the taking of high quality Photographs which embody the proper focus, exposure, composition and content), and as an independent contractor, Photographer's conduct and appearance shall be professional at all times while performing any duties pursuant to this letter agreement, including dealing courteously with all individuals that Photographer comes in contact with during the course of such performance.

4

5.     Relationship of Parties.  In performing the services hereunder for the Bulls pursuant to this letter agreement, Photographer shall act in the capacity of an independent contractor with respect to the Bulls, and Photographer shall not be deemed an employee or agent of the Bulls.  As an independent contractor, Photographer shall not have any right or authority to assume or create any obligations or to make any representations on behalf of the Bulls unless specifically authorized by the Bulls in each instance.  Photographer shall have and maintain complete control of any assistants used by Photographer in rendering services pursuant to this letter agreement.  In addition, Photographer is responsible for paying all taxes and making all withholdings required under federal, state or local law for Photographer and all of his assistants used to perform the services pursuant to this letter agreement.  Photographer shall, at his own expense, comply with, and be solely responsible for any liability arising out of, all applicable provisions of workers' compensation laws, unemployment compensation laws, Federal Social Security law, the Fair Labor Standards Act, Federal, state and local income tax laws and all other applicable Federal, state and local laws, regulations and codes relating to terms and conditions of employment required to be fulfilled by employers or independent contractors.

6.     Indemnification.  Photographer shall indemnify and hold the Bulls and its affiliates, and its and their respective partners, employees and agents (collectively, the "**Bulls Parties**"),  harmless from and against any and all claims, assignments, liabilities, damages, losses, obligations, judgments, and expenses (including reasonable attorneys' fees and expert fees) relating to, resulting from, or arising out of:  (i) any  breach by Photographer of any of the terms and conditions of this letter agreement or (ii) the negligence or willful misconduct of Photographer in connection with Photographer's performance of the services hereunder.

7.     Release.  Photographer hereby (i) acknowledges the risk and danger incidental to shooting pictures at Home Games, including, without limitation, the danger of being injured by thrown balls and contact with players and officials, and (ii) releases and discharges the Bulls Parties from and against any and all claims, suits, losses, damages, expenses, costs, and liabilities which hereinafter may accrue or arise against the Bulls Parties and which in any way arise out of, or are in any way related to, any personal injury or death or damage to or destruction of equipment or other property suffered by Photographer in connection with Photographer's provision of services hereunder.

8.     Confidentiality.  Photographer shall keep confidential and shall not disclose any nonpublic confidential information of the Bulls or any of its affiliates or sponsors, except as required by law or court order; nor shall Photographer use such confidential information for its own or any third party's benefit.  If Photographer elects to employ or engage assistants to aid in the provision of services hereunder, Photographer shall take such action reasonably necessary to ensure that such assistants keep such information confidential as provided herein.

9.     Assignment.  Photographer may not delegate any of his obligations hereunder without the prior written consent of the Bulls.  Photographer may not assign or otherwise transfer any of his rights in the Future Work without the prior written consent of the Bulls, except that Photographer may assign or transfer his rights in Future Work to his spouse, children, heirs, devisees, or beneficiaries without the Bulls' consent.   This Agreement does not restrict Photographer from assigning or otherwise transferring his rights in Prior Work.   Except as

5

otherwise expressly provided herein, all covenants and agreements contained in this letter agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective legal representatives, heirs, successors and permitted assigns of the parties hereto whether so expressed or not, including, without limitation, if any right in the Work is assigned by Photographer pursuant to this Section 9, such assignment shall be subject to the terms and conditions contained herein (including, without limitation, the License).

      10.   <u>Entire Agreement</u>.  This letter agreement sets forth the entire agreement and understanding between the parties relating to the subject matter hereof and may not be modified, amended, or changed except by written instrument, signed by both parties hereto.  This letter agreement supercedes all prior agreements entered into between the parties relating to the subject matter hereof, including, without limitation, that certain letter agreement, dated July 25, 1990, between the Bulls and Photographer.

      11.   <u>Governing Law</u>.  This letter agreement has been executed in the State of Illinois, and its validity, interpretation, performance, and enforcement will be governed by the laws of such state, without regard to conflicts of laws principles.

Please sign below confirming your understanding and agreement with the terms and conditions of this letter agreement and return to us an executed copy.


Sincerely,

**CHICAGO PROFESSIONAL SPORTS
LIMITED PARTNERSHIP**


Stephen M. Schanwald
Executive Vice President – Business Operations


**ACKNOWLEDGED AND ACCEPTED AS OF
THE DATE FIRST SET FORTH ABOVE:**


Bill Smith, on behalf of himself
and Bill Smith Photography

EXHIBIT B

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "*Agreement*") dated as of March 31, 2021 (the "*Effective Date*") is entered into by and between Dwight Manley, Inc., a California corporation ("*Buyer*"), and Bill Smith, a resident of Illinois doing business as Bill Smith Photography ("*Seller*").

## R E C I T A L S

A.      Seller is the sole owner of a collection of original negatives and transparencies created by Seller before July 1, 2005 that include players from the Chicago Bulls (the "*Bulls*"), including at games, airplane rides, locker rooms, hotel rooms, office head shots, press conferences, clinics, auctions, team shoots, White House visits, bench shots, restaurant settings, and/or other related photography events (collectively, and together with the Digital Scans referred to below, the "*Bulls Collection*").

B.      The Bulls Collection was created by Seller prior to July 1, 2005 while Seller was taking photographs of the Bulls. Seller has other photographs of Bulls players taken with permission from the Bulls on and after July 1, 2005 while Seller was an independent contractor team photographer for the Bulls pursuant to that certain letter agreement dated July 1, 2005 by and between the Bulls and Seller (the "*Photography Agreement,*" which is attached hereto as Exhibit A).

C.      Seller desires to sell to Buyer, and Buyer desires to purchase, all of Seller's right, title and interest in and to the Bulls Collection, under the terms and conditions of this Agreement.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **PURCHASE AND ASSIGNMENT**.

1.1      **Purchase and Assignment of Rights In the Bulls Collection**.  Seller hereby sells, assigns, transfers, conveys, sets over and delivers to Buyer, and Buyer hereby purchases, acquires and accepts from Seller, all of Seller's right, title and interest, throughout the world, in and to the Bulls Collection, subject to the retained rights and license back to Seller identified in Section 4 and the limitations set forth in Section 5.  Seller acknowledges that the purchase and sale includes all of Seller's right, title and interest in and to the color transparencies and color and black and white negatives included in the Bulls Collection and all of Seller's rights under copyright, if any, in and to the images comprising the Bulls Collection.  Further, Seller waives any rights of authorship and all moral rights ("droit morale") to each image in the Bulls Collection that may be granted under the U.S. Copyright Act (Title 17, U.S. Code).

1.2     **No Assumption of Liabilities**.  Seller is not transferring and Buyer is not assuming any liabilities of Seller.  Buyer shall not assume any income tax, sales tax, or other tax obligations of Seller.

1.3     **Taxes**.  Seller shall be responsible for all taxes that may be imposed upon Seller as a result of the sale of the Bulls Collection under this Agreement.

2.      **PURCHASE PRICE; CLOSING**.



of this Agreement.

2.2     **Effective Date**.  The purchase and sale of the Bulls Collection shall be effective on completion of the deliveries at Closing.

2.3     **Seller's Deliveries**.  At Closing, Seller shall hand deliver the following documents and instruments to Buyer:

        (a)     An executed bill of sale in the form attached as Exhibit B, dated as of the Closing date for the physical Bulls Collection;

        (b)     All materials in the Bulls Collection; and



").    (the "***Digital Scans***



4.      **GRANT BACK TO SELLER; MATERIALS RETAINED BY SELLER**.  Seller will be entitled to retain possession of any prints of images in the Bulls Collection that were in Seller's possession as of the Effective Date (*"**Seller's Existing Prints**"*), and to retain a digital copy of the Digital Scans (the *"**Licensed Materials**"*).  Seller retains the right to sell, gift, donate, or otherwise transfer Seller's Existing Prints, with the limited restriction that if sold, Seller will stamp each such Seller's Existing Print, on the back, with the following copyright notice, "Photography © [Year] Dwight Manley, Inc."  Seller will be entitled to, and Buyer hereby grants to Seller a limited license to: (a) use, reproduce, display, and distribute Seller's Existing Prints and the Licensed Materials (including prints made from the Digital Scans), and derivative works based thereon, solely to promote himself or his business and for educational purposes, including in websites and social media sites and as part of online and in-person presentations and appearances (whether paid or unpaid); and (b) with Buyer's prior consent, which will not be unreasonably withheld, donate items from the Licensed Materials, including copies or prints, to charitable organizations for sale by them for fundraising purposes.  Seller's rights under such limited license may be transferred to any descendent or heir of Seller, to any trust for the benefit of such persons or Seller, or any entity wholly owned by one or more of such trusts, such persons, or Seller.  Except as provided in this Section 4, Seller will not sublicense, sell, gift or transfer the Licensed Materials or any rights in or to the Licensed Materials to third parties for any purpose.

5.      **REPRESENTATIONS AND WARRANTIES OF SELLER**. Seller represents and warrants to Buyer as follows:

        5.1    **Authority**.  Seller has full legal capacity, right and power to execute and deliver this Agreement and to perform Seller's obligations hereunder.

        5.2    **No Conflict**.  The execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) conflict with or result in a violation or breach of any provision of any law or governmental order applicable to Seller or the Bulls Collection; (b) require the consent, notice or other action by any person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any contract to which Seller

-3-

is a party or by which Seller is bound or to which the Bulls Collection is subject; or (c) result in the creation or imposition of any lien or encumbrance on the Bulls Collection.

5.3     **Rights; Enforceability**.  To the best of his knowledge, Seller is the holder of sufficient rights, including all copyright (if any) in and to each image within the Bulls Collection, to enter into and perform the obligations hereunder according to the terms of this Agreement and no other person's permission is required for Seller to convey the rights granted under this Agreement.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

5.4     **Liabilities, Debts, etc.**  To the best of his knowledge, Seller has no liabilities, debts, obligations or responsibilities (and is subject to no claims), fixed or contingent, liquidated or unliquidated, secured or unsecured, or of any other kind, that may affect the sale of the Bulls Collection.

5.5     **Title to the Bulls Collection**.  To the best of his knowledge, Seller possess all right, title and interest in and to the Bulls Collection, free and clear of all claims, liens, security interests, charges, leases, encumbrances, licenses or sublicenses and other restrictions of any nature, except as limited by the Photography Agreement.  To the best of Seller's knowledge, except for the Photography Agreement and the third party rights referred to in Section 5.13, there is no restriction, agreement (oral or otherwise), or law that would impede Buyer's ability to fully use and make commercial use of each item in the Bulls Collection.

5.6     **Prior Practice of the Bulls Collection**.  The reference to "Photographer's prior practice with respect to the Prior Work" in the Photography Agreement refers to Seller's practice of creating, marketing, and selling photographs, negatives, images, and other photography materials for a commercial purpose, whether to magazines, books, or any other kind of publication, physically or digitally.

5.7     **No Brokers**.  Seller is not contractually obligated to pay any compensation to any third party with respect to the Bulls Collection.

5.8     **No Infringement**.  To the best of Seller's knowledge, the use, sale, distribution, transmission, licensing or sublicensing of the Bulls Collection does not infringe on any copyright of any third party and there have been no claims asserted or threatened by any third party that would in any way impair, curtail or diminish Buyer's rights in and to the Bulls Collection.

5.9     **No Conflicting Licenses**.  There are no currently existing licenses or grants of distribution rights in and to the images within the Bulls Collection (including third party contractual restrictions, written or oral) that the transactions contemplated by this Agreement would violate or with which the transactions contemplated by this Agreement would conflict.

5.10    **Legal Proceedings**. There are no claims, suits, actions, arbitrations, legal, administrative or other proceedings or governmental investigations to which Seller is a party or which are, to the knowledge of Seller, threatened against Seller that affect the Bulls Collection. Seller is not in default with respect to any judgment, order, writ, injunction, decree or award of any governmental agency or of any arbitrator or arbitration panel with respect to the Bulls

Collection. To the best of Seller's knowledge, Seller has complied and is in compliance with all laws and regulations with respect to the Bulls Collection and the commercialization thereof.

5.11   **Contracts**.   The Photography Agreement, and the prior July 25, 1990 letter agreement between Seller and the Bulls which the Photography Agreement, by its terms, superseded, are the only agreements of any kind that Seller has entered into (orally or otherwise) with respect to the Bulls Collection. There has been no breach by either Seller or, to Seller's knowledge, the Bulls of the Photography Agreement and neither party has given the other notice of a breach of the Photography Agreement.

5.12   **Access and Compliance with NBA**.  Seller was granted access to the NBA players shown in the Bulls Collection during games and other events to take photographs behind the scenes, including at the White House, on the team plane, in the locker room, and other locations not accessible to the general public. At all times in the creation of the Bulls Collection, Seller complied with all rules and regulations promulgated by the National Basketball Association ("***NBA***") and the Constitution, By-laws and organizational agreements, rulings and orders of the NBA.

5.13   **Rights of Third Parties.** Seller makes no representation or warranty that the display, reproduction, sale, or any other use of images in the Bulls Collection will not violate any privacy or publicity rights of the NBA players or other individuals depicted in the images, any rights of the NBA, NBA teams, or other third parties in trademarks depicted in the images, any copyrights in third-party works depicted in the images, or other third-party rights of or in the persons and things depicted in the images.  Buyer will be solely responsible, at its cost, for obtaining any permissions or licenses under such third-party rights that may be required for Buyer's use or exploitation of the Bulls Collection, and for defending any third-party claim that any display, reproduction, sale, distribution, or other use or exploitation of the Bulls Collection by Buyer, its principal or principals, or their agents, customers, or licensees violates such rights. Buyer will defend, indemnify, and hold Seller harmless against any such third-party claims.

6.     **REPRESENTATIONS AND WARRANTIES OF BUYER**. Buyer hereby represents and warrants to Seller as follows:

6.1   **Authority**.  Buyer has full legal right and power to execute and deliver this Agreement and to perform its obligations hereunder.  No other proceedings on the part of Buyer are necessary for the execution and delivery of all this Agreement and all other transaction documents to which it is a party, and the performance of its obligations hereunder and thereunder.

6.2   **Enforceability**.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

6.3   **No Brokers**.  Buyer is not contractually obligated to pay any compensation to any third party with respect to the Bulls Collection.

7.     **NEW IMAGES**. Any negatives or transparencies in the Bulls Collection that are discovered after the Effective Date by Seller ("***New Images***") shall promptly (but in no case more

than 14 days after discovery) be delivered to Buyer at the address set forth on the signature page hereto. Seller shall be responsible for the cost of shipping any New Images to Buyer at the address set forth on the signature page hereto or other location reasonably requested by Buyer.

8.    **ATTRIBUTION.** ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████     ████████████████████████

9.    **MISCELLANEOUS**.

9.1    **Expenses**.  Seller and Buyer shall pay their own fees and expenses incident to the negotiation, preparation, execution, delivery and performance of this Agreement.

9.2    **Waiver and Modification**. Neither party waives any rights under this Agreement by delaying or failing to enforce them.  This Agreement supersedes all prior agreements or understandings, written or oral, of Seller and Buyer, and incorporates the entire understanding of the parties. In deciding to enter into this Agreement, neither party has relied on any statements, representations, or promises from the other that are not expressly set forth in this Agreement.  This Agreement may be amended or supplemented only by a written instrument signed, by the party against whom the amendment or supplement is sought to be enforced.   When used in this Agreement, the term "including" does not limit the preceding terms.

9.3    **Survival**.   The representations, warranties and covenants set forth in this Agreement shall survive the sale of the Bulls Collection.

9.4    **Governing Law**.  The purchase and sale of the Bulls Collection shall take place in the State of Nevada, and this Agreement shall be construed in accordance with and governed by the laws of the State of Nevada applicable to contracts made and to be performed in Nevada, exclusive of its conflict of law rules.  The parties agree that Nevada shall be the exclusive proper place of venue for any action, dispute, or controversy arising from or in connection with this Agreement.

9.5    **Successors and Assigns**. This Agreement shall inure to the benefit of and be binding upon the permitted heirs, executors, administrators, successors and assigns of the parties.

9.6    **Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually

acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.7     **Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.8     **Specific Performance.**  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

9.9     **Counterparts**.  This Agreement may be executed in any number of counterparts and each such executed counterpart shall be deemed to be an original instrument, but all such executed counterparts together shall constitute one and the same instrument.

9.10     **Confidentiality**. The terms of this Agreement shall not be disclosed by either party except to confirm that a sale has occurred, provided however, each party may disclose such information to its attorneys and other consultants on a need to know basis with instructions that such parties comply with the provisions of this Section, if legally compelled to do so provided that it promptly informs the other party of the required disclosure, and in connection with efforts to resolve a dispute relating to this Agreement after giving the other party sufficient notice and opportunity to seek a protective order.  Notwithstanding the foregoing, any party may disclose the existence of this Agreement and any information about this Agreement that becomes available to the public through no fault of the parties.

9.11     **Further Assurances**.  At Buyer's request, without further consideration but at no out-of-pocket expense to Seller, Seller shall execute and deliver such instruments and take such other action as may be requested by Buyer to perfect Buyer's rights in the Bulls Collection.  In this regard, Seller agrees to reasonably cooperate with Buyer in the filing and prosecution by Seller of any copyright applications covering images in the Bulls Collection and to execute a copyright assignment as necessary in connection with such copyright applications.

9.12     **Representation By Attorney**. The parties hereto represent that each has been represented in the preparation of this Agreement by counsel of its own choosing, at its own expense.  Each party further represents that each of them has read this Agreement and is fully aware of its intent and legal effect, and that each of them has not been influenced to any extent whatsoever by any representations made by the other except as expressly set forth in this Agreement.  Each party further represents that each of them participated in the negotiation of this Agreement, and that it will not be interpreted against either of them as the draftsman in the event of a dispute about this Agreement.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date and year first written above.

**SELLER:**

_____

BILL SMITH d/b/a BILL SMITH PHOTOGRAPHY

Address: 360 West Illinois Street, Unit 616, Chicago, IL 60654

**BUYER:**

DWIGHT MANLEY, INC.

By: _____

Dwight Manley, _BREA/CD_

Address: 330 Birch #201
Brea, CA 92821

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date and year first written above.

**SELLER:**

_(signature)_
_____
BILL SMITH d/b/a BILL SMITH PHOTOGRAPHY

Address: 360 West Illinois Street, Unit 616, Chicago, IL 60654

**BUYER:**

DWIGHT MANLEY, INC.

By: _____
     Dwight Manley, _____

Address:

15461751.15

EXHIBIT A

Photography Agreement

# CHICAGO BULLS

*Six-Time World Champions*   91 · 92 · 93 · 96 · 97 · 98

July 1, 2005

Mr. Bill Smith
Bill Smith Photography
360 West Illinois Street
Suite 616
Chicago, IL 60610

Dear Bill:

We (the "**Bulls**") are pleased to continue to engage you and your venture, Bill Smith Photography (collectively referred to herein as "**Photographer**"), as our team photographer under the following terms and conditions:

1.     Services and Term.

        (a)    Engagement. The Bulls hereby engage Photographer, and Photographer hereby accepts such engagement, to serve as the Bulls' team photographer and provide services for the Bulls pursuant to the terms of this letter agreement.

        (b)    Scope of Duties and Services. Each Term Year (as defined below), Photographer shall (i) shoot pictures (collectively, "**Game Photographs**") at each Bulls' pre-season, regular season and post-season home game occurring during such Term Year (each, a "**Home Game**") (including pictures of game action and pre- and post-game and half-time activities) consistent with past practice, (ii) shoot pictures at ten (10) non-game related photo shoots (including, but not limited to, front office head photos, press conferences, clinics, auctions and at home photos with Bulls' players) as directed by the Bulls consistent with past practice (collectively, "**Non-Game Photographs**"), (iii) shoot team photos and pictures to be used for LuvaBulls' posters as directed by the Bulls consistent with past practice (collectively, "**Additional Photographs**," and collectively with the Game Photographs and the Non-Game Photographs, the "**Photographs**"), and (iv) use his reasonable efforts to make himself available to shoot Non-Game Photographs at additional non-game related photo shoots in excess of ten (10) as requested by the Bulls (each, an "**Extra Shoot**"). The format of the Photographs shall be determined by the Bulls consistent with past practice. Photographer agrees to report to each Home Game no later than one and one-half ($1^1/_2$) hours prior to each such Home Game.

        (c)    Delivery of the Photographs. Photographer agrees to deliver to the Bulls all Game Photographs no later than twenty-four (24) hours following the conclusion of any Home Game at which such Game Photographs were taken. Photographer and the Bulls shall mutually agree upon the date of delivery to the Bulls by Photographer of the Non-Game Photographs and the Additional Photographs on a case-by-case basis consistent with past



practice. All Photographs delivered by Photographer to the Bulls shall be delivered in a format determined by the Bulls consistent with past practice.

(d)     Term.  The term of this letter agreement shall begin on July 1, 2005 and shall end on June 30, 2006; provided that this letter agreement shall automatically renew for successive one (1) year periods (such initial one-year period and each successive one-year period shall each be referred to herein as a "**Term Year**") unless either party gives the other party written notice of such party's intention to terminate this letter agreement at least thirty (30) days prior to the expiration of the then current Term Year, and such termination shall be effective as of the end of the then current Term Year.

2.     Fees and Expenses.

(a)     Fee.   In consideration for Photographer's performance of the services hereunder, (i) each Term Year the Bulls shall pay Photographer an aggregate fee equal to



(b)     Invoices.  For each Term Year, Photographer shall submit to the Bulls written invoices specifying the payment owed to Photographer pursuant to **Sections 2(a)** and **2(c)** and all back-up documentation substantiating expenses incurred by Photographer hereunder (including, without limitation, copies of all invoices, receipts and bills evidencing such expenses), and the Bulls shall pay such invoices on an annual or semi-annual basis consistent with past practice.

(c)     Reimbursement of Expenses.  Photographer shall be reimbursed for all reasonable out-of-pocket expenses incurred by Photographer outside of the ordinary course of business in the performance of any Extra Shoot consistent with past practice.

(d)     Assistants.  Bill Smith shall devote such time, attention, skills and efforts as may be necessary to enable Photographer to effectively perform the services hereunder. In the event Photographer needs to employ or engage assistants to aid in the provision of services hereunder, all of the terms and conditions of this letter agreement shall apply equally to Photographs taken, and services provided, by any such assistants.  Photographer shall be responsible for any breach of this letter agreement arising from the work of any such assistants,

and Photographer shall ensure that all rights, title and interest in and to any Work (as defined below) created by any such assistants is vested in Photographer. Prior to employing or engaging any assistant to aid in the provision of services hereunder, Photographer shall (i) cause such assistant to execute a Work Made For Hire Agreement with Photographer, in the form set forth as Exhibit A to this letter agreement, and (ii) provide to the Bulls a complete copy of each such executed Work Made For Hire Agreement.

       3.     Ownership and License of the Work.

       (a)     All photographs, transparencies, negatives, digital pictures, compact discs and other property, works of authorship and work product which Photographer (or his assistants), alone or jointly, has created, conceived, developed or reduced to practice pursuant to or in connection with his provision of photography services to or on behalf of the Bulls prior to the date hereof will collectively and individually hereinafter be referred to as the "**Prior Work**." All photographs, transparencies, negatives, digital pictures, compact discs and other property, works of authorship and work product which Photographer may, alone or jointly, in the future create, conceive, develop, or reduce to practice pursuant to or in connection with his provision of the services hereunder or any other services to or on behalf of the Bulls, will collectively and individually hereinafter be referred to as the "**Future Work**." (The Prior Work and the Future Work are referred to collectively as the "**Work**.")

       (b)     The Bulls hereby agree, as between Photographer and the Bulls, that (i) Photographer owns the copyrights in the Work, subject to the License (as defined below) and the provisions set forth in **Sections 3(d)**, **3(e)** and **4**, and (ii) at the written request of the Bulls and at the Bulls' expense, Photographer will apply to register the Work with the United States Copyright Office, which registrations shall be subject to the License and the respective rights and obligations of the parties set forth in this letter agreement.

       (c)     Photographer hereby grants the Bulls a royalty-free, irrevocable, perpetual, transferable, sublicensable license (the "**License**") to use, display, publish, copy, record, distribute, augment, subtract from, modify, distort, translate, transfer copies of, combine with other information or materials, create derivative works based on, sell copies of or otherwise exploit, for any purpose, the Work and any portion thereof, in any manner or media throughout the world, as the Bulls may in its sole discretion determine. Any assignee, transferee, or sublicensee of the License or of the Bulls' other rights under this Agreement will not be entitled to sell, rent, or lease images or copies of the Work or any portion thereof without Photographer's prior written consent. The License shall be non-exclusive as to the Prior Work, and shall be exclusive to the Bulls with respect to the Future Work, subject to the rights expressly retained by Photographer as described in **Section 3(d)**. If the Bulls become aware of any facts that lead the Bulls to reasonably believe that any third party is infringing any copyrights in the Future Work ("**Infringement**"), then the Bulls shall give Photographer written notice thereof. If Photographer, after notice from the Bulls, declines to pursue, or fails to pursue within thirty (30) days of receipt of such notice, legal action against an Infringement, then the Bulls, as an exclusive licensee of the Future Work and at its expense, shall have the right, in its own name or on Photographer's behalf, without obligation to consult with, or account to, Photographer, to prosecute (and retain and recover damages with respect to) such Infringement. Photographer

shall reasonably cooperate with the Bulls in connection with any such prosecution.  In the event Photographer becomes aware of any Infringement, then Photographer shall give the Bulls written notice thereof promptly after becoming aware of such Infringement.  If Photographer pursues legal action against any Infringement, which shall be at Photographer's expense, Photographer will be entitled to retain all damages recovered, and the Bulls shall reasonably cooperate with Photographer in connection with any such prosecution.

(d)     Subject to **Sections 3(e) and 4**, (i) as to the Prior Work, Photographer retains all rights to use and permit others to use the Prior Work in any fashion, including selling images that are part of the Prior Work, and (ii) as to the Future Work, Photographer retains the right to sell images that are part of the Future Work to any magazine or publication consistent with Photographer's prior practice with respect to the Prior Work.  The parties acknowledge that NBA Documents will not be deemed to amend this letter agreement with respect to the ownership of the copyrights in the Work.

(e)     Nothing contained herein shall be deemed to confer upon Photographer, during the term of this letter agreement or thereafter, any rights in, or license to, any Bulls' trade names, trademarks, logos, identifications and the like, or any rights of publicity or other rights of any NBA player, all of which shall be and remain the sole property of the Bulls, the National Basketball Association ("**NBA**") and/or any such NBA player, as the case may be.

(f)     The Bulls agree to give Photographer a photo credit wherever possible in Bulls' publications in which the Photographs are used consistent with past practice.

4.     <u>Representations; Warranties and Covenants</u>.  Photographer represents, warrants and covenants to the Bulls that: (a) Photographer has the legal right and capacity to enter into this letter agreement, (b)  while Photographer continues to serve as the Bulls' team photographer under this Agreement, Photographer will comply with any and all rules and regulations promulgated by the NBA and the Constitution, By-laws and organizational agreements, rulings or orders of the NBA ("**NBA Documents**") in connection with Photographer's creation and use of the Work and the performance of the services provided hereunder, (c) Photographer will comply with all applicable laws, rules and regulations in connection with the  performance of the services provided hereunder, (d) none of the Works created by Photographer or any person employed or retained by Photographer will infringe the copyright or other rights of any other person or entity, (e) other than the License and as permitted under **Section 3(d)** or **9,** neither Photographer nor any other person employed or retained by Photographer has granted or will grant any license or other rights to the Works to any other person or entity and no other person or entity has any such rights, and (f) Photographer agrees to perform the services hereunder in a professional manner and in accordance with the highest standards of the professional sports photography industry (including, without limitation, the taking of high quality Photographs which embody the proper focus, exposure, composition and content), and as an independent contractor, Photographer's conduct and appearance shall be professional at all times while performing any duties pursuant to this letter agreement, including dealing courteously with all individuals that Photographer comes in contact with during the course of such performance.

5.    Relationship of Parties.   In performing the services hereunder for the Bulls pursuant to this letter agreement, Photographer shall act in the capacity of an independent contractor with respect to the Bulls, and Photographer shall not be deemed an employee or agent of the Bulls.  As an independent contractor, Photographer shall not have any right or authority to assume or create any obligations or to make any representations on behalf of the Bulls unless specifically authorized by the Bulls in each instance.  Photographer shall have and maintain complete control of any assistants used by Photographer in rendering services pursuant to this letter agreement.  In addition, Photographer is responsible for paying all taxes and making all withholdings required under federal, state or local law for Photographer and all of his assistants used to perform the services pursuant to this letter agreement.  Photographer shall, at his own expense, comply with, and be solely responsible for any liability arising out of, all applicable provisions of workers' compensation laws, unemployment compensation laws, Federal Social Security law, the Fair Labor Standards Act, Federal, state and local income tax laws and all other applicable Federal, state and local laws, regulations and codes relating to terms and conditions of employment required to be fulfilled by employers or independent contractors.

6.    Indemnification.   Photographer shall indemnify and hold the Bulls and its affiliates, and its and their respective partners, employees and agents (collectively, the "**Bulls Parties**"),   harmless from and against any and all claims, assignments, liabilities, damages, losses, obligations, judgments, and expenses (including reasonable attorneys' fees and expert fees) relating to, resulting from, or arising out of:  (i) any  breach by Photographer of any of the terms and conditions of this letter agreement or (ii) the negligence or willful misconduct of Photographer in connection with Photographer's performance of the services hereunder.

7.    Release.   Photographer hereby (i) acknowledges the risk and danger incidental to shooting pictures at Home Games, including, without limitation, the danger of being injured by thrown balls and contact with players and officials, and (ii) releases and discharges the Bulls Parties from and against any and all claims, suits, losses, damages, expenses, costs, and liabilities which hereinafter may accrue or arise against the Bulls Parties and which in any way arise out of, or are in any way related to, any personal injury or death or damage to or destruction of equipment or other property suffered by Photographer in connection with Photographer's provision of services hereunder.

8.    Confidentiality.   Photographer shall keep confidential and shall not disclose any nonpublic confidential information of the Bulls or any of its affiliates or sponsors, except as required by law or court order; nor shall Photographer use such confidential information for its own or any third party's benefit.  If Photographer elects to employ or engage assistants to aid in the provision of services hereunder, Photographer shall take such action reasonably necessary to ensure that such assistants keep such information confidential as provided herein.

9.    Assignment.   Photographer may not delegate any of his obligations hereunder without the prior written consent of the Bulls.  Photographer may not assign or otherwise transfer any of his rights in the Future Work without the prior written consent of the Bulls, except that Photographer may assign or transfer his rights in Future Work to his spouse, children, heirs, devisees, or beneficiaries without the Bulls' consent.   This Agreement does not restrict Photographer from assigning or otherwise transferring his rights in Prior Work.  Except as

otherwise expressly provided herein, all covenants and agreements contained in this letter agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective legal representatives, heirs, successors and permitted assigns of the parties hereto whether so expressed or not, including, without limitation, if any right in the Work is assigned by Photographer pursuant to this Section 9, such assignment shall be subject to the terms and conditions contained herein (including, without limitation, the License).

      10.    <u>Entire Agreement</u>. This letter agreement sets forth the entire agreement and understanding between the parties relating to the subject matter hereof and may not be modified, amended, or changed except by written instrument, signed by both parties hereto. This letter agreement supercedes all prior agreements entered into between the parties relating to the subject matter hereof, including, without limitation, that certain letter agreement, dated July 25, 1990, between the Bulls and Photographer.

      11.    <u>Governing Law</u>. This letter agreement has been executed in the State of Illinois, and its validity, interpretation, performance, and enforcement will be governed by the laws of such state, without regard to conflicts of laws principles.

Please sign below confirming your understanding and agreement with the terms and conditions of this letter agreement and return to us an executed copy.

Sincerely,

**CHICAGO PROFESSIONAL SPORTS
LIMITED PARTNERSHIP**

Stephen M. Schanwald
Executive Vice President – Business Operations

**ACKNOWLEDGED AND ACCEPTED AS OF
THE DATE FIRST SET FORTH ABOVE:**

Bill Smith, on behalf of himself
and Bill Smith Photography

EXHIBIT B

Bill of Sale

THIS BILL OF SALE (this "**Bill of Sale**"), dated as of _____, 2021, is by Bill Smith, a resident of Illinois doing business as Bill Smith Photography ("**Seller**"), in favor of Dwight Manley, Inc., a California corporation ("**Buyer**").

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged by execution of this document, and pursuant to that certain Purchase and Sale Agreement dated as of even date herewith, by and between Seller and Buyer (the "**Purchase Agreement**"), Seller does hereby grant, convey, transfer, assign, bargain, sell, deliver, and set over unto Buyer, its successors and assigns, forever, all of Seller's right, title, and interest in and to each and every item of tangible personal property included in the Bulls Collection, as provided in and subject to the limitations set forth in the Purchase Agreement. Capitalized terms used herein which are not otherwise defined shall have the respective meanings given to them in the Purchase Agreement.

Nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale. If any conflict exists between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

This Bill of Sale shall in all respects be governed by, and construed in accordance with the laws of the State of Nevada, including all matters of construction, validity, and performance.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered on the day and year specified above.

SELLER:

_____
BILL SMITH d/b/a BILL SMITH PHOTOGRAPHY

EXHIBIT C

## BILL OF SALE AND COPYRIGHT ASSIGNMENT

THIS BILL OF SALE AND COPYRIGHT ASSIGNMENT (this "Agreement"), dated
June 14,     2021 (the "Effective Date"), is entered into by and between Dwight Manley,
Inc., a California corporation ("Assignor"), GOATPIX LLC, a Nevada limited liability company
("Assignee"), and Dwight Manley ("Manley").

### Recitals

A.     Reference is made to that certain Purchase and Sale Agreement, dated March 31,
2021, by and between Assignor and Bill Smith (the "Asset Agreement"), pursuant to which
Assignor purchased from Bill Smith certain photography assets more particularly described in the
Asset Agreement.  Capitalized terms not otherwise defined in this Agreement have the meanings
given them in the Asset Agreement.

B.     Manley, as 100% owner of Assignor, desires to contribute the assets acquired and
liabilities assumed in the Asset Agreement (collectively, the "Acquired Assets") to Assignee, as
fully as if Assignee was the purchaser of the Acquired Assets under the Asset Agreement, and
Assignee desires to assume all of the Acquired Assets.

C.     As more fully set forth in the Limited Liability Company Agreement of Assignee,
Assignee desires to issue to Manley (through his trust DVC Revocable Trust), 90% of the
membership interests in Assignee as consideration for the contribution of the Acquired Assets.

### Agreement

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other
good and valuable consideration, the receipt and sufficiency of which are acknowledged, the
parties agree as follows:

1.     Assignment. As of the Effective Date, for and in consideration of the covenants,
stipulations and agreements hereinafter set forth, Assignor hereby sells, conveys, assigns, transfers
and delivers to Assignee, its successors and assigns, free and clear of all encumbrances, all of
Assignor's right, title and interest in and to the Acquired Assets, including any copyright assets
acquired thereunder.

2.     Assumption. Assignee hereby affirmatively assumes all of Assignor's liabilities
associated with and agrees to fully perform the obligations of Assignor as required under the Asset
Agreement.

3.     Consideration. In consideration for the assignment and assumption of the Acquired
Assets, Assignee issues to DVC Revocable Trust 90% of the membership interests in Assignee
(the "Consideration").

4.     Further Assurances. Assignor and Assignee each covenants and agrees that it will, at
any time and from time to time, execute, acknowledge, and deliver any and all other deeds,
assignments, transfers, conveyances, powers of attorney, or other instruments that such party

16099628

deems reasonably necessary or proper to carry out the assignments, conveyances and assumptions intended to be made hereunder.

5. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.

6. <u>Governing Law</u>. This Agreement shall be construed, enforced, and governed in accordance with the laws of the State of Nevada.

7. <u>Treatment of Transaction</u>. For federal tax purposes, the contribution of the Acquired Assets hereunder shall be treated as following the following distribution steps:

    a.  first, a distribution of the Acquired Assets from Assignor to Manley;

    b.  second, a contribution of the Acquired Assets from Manley to Assignee in exchange for the Consideration; and

    c.  third, an assignment of the Consideration from Manley to DVC Revocable Trust.

8. <u>Counterparts</u>. This Agreement may be executed in counterparts and signatures may be delivered by email, PDF, or other electronic transmission, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

9. <u>Further Assurances</u>. At either parties' request, without further consideration, the parties shall each execute and deliver such instruments and take such other action as may be requested by either party to perfect Assignee's rights in the Bulls Collection (as defined in the Asset Agreement) as well as the assumption of the Acquired Assets. Assignor agrees to reasonably cooperate with Assignee in the filing and prosecution of any copyright applications covering images in the Bulls Collection and to execute a copyright assignment as necessary in connection with such copyright applications.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date.

**ASSIGNOR:**

Dwight Manley, Inc.

By: _____
Name: Dwight Manley
Title: President

**ASSIGNEE:**

GOATPIX LLC

By: _____
Name: Dwight Manley
Title: Manager

**MANLEY:**

_____
Dwight Manley

16099628

EXHIBIT D



EXHIBIT E

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## VA 2-257-251

**Effective Date of Registration:**
June 11, 2021
**Registration Decision Date:**
July 02, 2021

---

## Title

**Title of Work:** mj_1002

## Completion/Publication

**Year of Completion:** 1988
**Date of 1st Publication:** March 08, 1998
**Nation of 1st Publication:** United States

## Author

- **Author:** Bill Smith
  **Author Created:** photograph
  **Work made for hire:** No
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Goatpix, LLC
330 W. Birch #201, Brea, CA, 92821, United States
**Transfer statement:** By written agreement

## Rights and Permissions

**Organization Name:** Law Office of Eric Ridley
**Name:** Eric Ridley
**Email:** ridley.eric@gmail.com
**Telephone:** (805)244-5291
**Address:** 567 W. Channel Islands Blvd. #210
Port Hueneme, CA 93041 United States

## Certification

**Name:**   Eric Ridley
**Date:**   June 11, 2021

# mj_1002



EXHIBIT F

UPPER DECK

Home    >    Michael Jordan Autographed 1988 Slam Dunk Framed Photo 30 x 40



🚚 Free Shipping

## Michael Jordan Autographed 1988 Slam Dunk Framed Photo 30 x 40

**$7,999.99**

| 1 | | ADD TO CART |

Signed By: Michael Jordan

Type: Framed Autographed Print

Size: 30" x 40"

Pen Color: Silver

Special Details: Framed

UPPER DECK

MEMORABILIA    TRADING CARDS    GAMES    GALLERY PRINTS

Home  ›  Michael Jordan Autographed 1988 Slam Dunk Backboard



 Free Shipping

# Michael Jordan Autographed 1988 Slam Dunk Backboard

## $7,999.99

| 1 | | ADD TO CART |

Signed By: Michael Jordan

Type: Framed Autographed Backboard

Size: 28.75" x 16.75"

Pen Color: Black

Special Details: Framed

MEMORABILIA   TRADING CARDS   GAMES   GALLERY PRINTS

Home  ›  Michael Jordan Autographed 1988 Slam Dunk Photo 30 x 40



☷ Free Shipping

## Michael Jordan Autographed 1988 Slam Dunk Photo 30 x 40

**$6,999.99**

| 1 | ADD TO CART |
|---|---|

Signed By: Michael Jordan

Type: Autographed Print

Size: 30" x 40"

Pen Color: Silver



MEMORABILIA     TRADING CARDS     GAMES     GALLERY PRINTS

Home   >   Michael Jordan Autographed City of Rings Framed

🚚 Free Shipping

# Michael Jordan Autographed City of Rings Framed

**$6,499.99**



1     ADD TO CART

**Limited To:** 123

**Signed By:** Michael Jordan

**Type:** Framed Autographed Print

**Size:** 36" x 15"

**Pen Color:** Gold

**Special Details:** Framed

EXHIBIT G

# Fwd: Introduction   c/clients/manley, dwight - copyright

Hello, yes 3pm is great. I am at 714-990-8748....Thank you

Dwight Manley
dmanleyinc@aol.com

-----Original Message-----
From: Hysni, Brittany <Brittany_Hysni@upperdeck.com>
To: Estee Portnoy <Estee.Portnoy@jumpdc.com>; Dwight Manley <dmanleyinc@aol.com>
Cc: Curtis Polk <curtis@acpolk.com>; Rand Sacks <rsacks@thesacksgroupllc.com>
Sent: Thu, Jun 10, 2021 10:34 am
Subject: RE: Introduction

Hi Dwight,

Nice to meet you. Are you available to chat at 3 pm today or tomorrow from 9 to 12:30, both PST?

Thanks,
Brittany

**Brittany Hysni**

General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

**From:** Estee Portnoy [mailto:Estee.Portnoy@jumpdc.com]
**Sent:** Thursday, June 10, 2021 10:09 AM
**To:** Dwight Manley <dmanleyinc@aol.com>; Hysni, Brittany <Brittany_Hysni@upperdeck.com>
**Cc:** Curtis Polk <curtis@acpolk.com>; Rand Sacks <rsacks@thesacksgroupllc.com>
**Subject:** Introduction

Brittany:  Please meet Dwight Manley who is working with photographer Bill Smith and our team.  He wanted to connect his counsel with UDA's counsel to talk about some photography rights.  I believe he has worked with UD in the past when he represented Dennis Rodman.

Would you be able to arrange a call with him?  Thanks!

**Estee R. Portnoy** | Senior Vice-President
**JUMP.DC**, a division of **Live Nation**
202.721.7209
estee.portnoy@jumpdc.com
5335 Wisconsin Avenue, NW, Suite 720 | Washington DC | 20015

---

**Dwight to Brittany & Me**                                                      JUN 11

Hi Eric and Brittany,

Eric, Can you please send Brittany the copies of the items that we have found that Upper Deck has issued with the 3:51picture we have found?

I have said that we are focused on making sure this does not continue rather than making the past an issue.

Thank you

Dwight Manley
dmanleyinc@aol.com

-----Original Message-----
From: Hysni, Brittany <Brittany_Hysni@upperdeck.com>
To: Dwight Manley <dmanleyinc@aol.com>
Sent: Thu, Jun 10, 2021 1:24 pm
Subject: RE: Introduction

Sure that sounds great, I will call you then.

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

**From:** Dwight Manley [mailto:dmanleyinc@aol.com]
**Sent:** Thursday, June 10, 2021 1:23 PM
**To:** Hysni, Brittany <Brittany_Hysni@upperdeck.com>
**Subject:** Re: Introduction

sure, 12:15 tomorrow ?

Dwight Manley
dmanleyinc@aol.com

-----Original Message-----
From: Hysni, Brittany <Brittany_Hysni@upperdeck.com>
To: Dwight Manley <dmanleyinc@aol.com>

Sent: Thu, Jun 10, 2021 1:20 pm
Subject: RE: Introduction

Hi Dwight,

I have a conflict now at 3. Any chance you're able to talk tomorrow at noon pst?

Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

**From:** Dwight Manley [mailto:dmanleyinc@aol.com]
**Sent:** Thursday, June 10, 2021 12:39 PM
**To:** Hysni, Brittany <Brittany_Hysni@upperdeck.com>; Estee.Portnoy@jumpdc.com
**Cc:** curtis@acpolk.com; rsacks@thesacksgroupllc.com
**Subject:** Re: Introduction

**Subject:** Re: Introduction

Hello, yes 3pm is great. I am at 714-990-8748....Thank you

Dwight Manley
dmanleyinc@aol.com


-----Original Message-----
From: Hysni, Brittany <Brittany_Hysni@upperdeck.com>
To: Estee Portnoy <Estee.Portnoy@jumpdc.com>; Dwight Manley <dmanleyinc@aol.com>
Cc: Curtis Polk <curtis@acpolk.com>; Rand Sacks <rsacks@thesacksgroupllc.com>
Sent: Thu, Jun 10, 2021 10:34 am
Subject: RE: Introduction

Hi Dwight,

Nice to meet you. Are you available to chat at 3 pm today or tomorrow from 9 to 12:30, both PST?


Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

**From:** Estee Portnoy [mailto:Estee.Portnoy@jumpdc.com]
**Sent:** Thursday, June 10, 2021 10:09 AM
**To:** Dwight Manley <dmanleyinc@aol.com>; Hysni, Brittany <Brittany_Hysni@upperdeck.com>

**Cc:** Curtis Polk <curtis@acpolk.com>; Rand Sacks <rsacks@thesacksgroupllc.com>
**Subject:** Introduction

Brittany:  Please meet Dwight Manley who is working with photographer Bill Smith and our team.  He wanted to connect his counsel with UDA's counsel to talk about some photography rights.  I believe he has worked with UD in the past when he represented Dennis Rodman.
Would you be able to arrange a call with him?  Thanks!

**Estee R. Portnoy** | Senior Vice-President
**JUMP.DC,** a division of **Live Nation**
202.721.7209
estee.portnoy@jumpdc.com
5335 Wisconsin Avenue, NW, Suite 720 | Washington DC | 20015


Brittany to Dwight & Me                                                      JUN 11

Thanks Dwight. Nice to meet you. As I mentioned during our call today, I would be shocked if UDC did not license the image at the time the piece was made, consistent with its current and past pattern and practice, but I appreciate the heads up on your recently acquired photo collection. Best of luck- sounds like a great collection!

Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

## Dwight Manley   c/clients/manley, dwight - copyright

To that end, Would you mind providing me with a copy of the UDC license for that image, at your earliest convenience? It's being used directly and in derivative form, across multiple Upper Deck products, and I'm in the middle of an internet-wide compliance sweep on that image. This will help me keep track of who is and who is not in compliance. My mandate is to enforce rights on this image much more assertively than has been the historic case.

As Dwight noted to you, he's not interested in the past, so please don't take this as any type of thinly veiled threat. I'm only interested in keeping and shaping compliance as we move forward.

Thanks in advance.

---

Brittany to Me                                                                                    JUN 14

Hi Eric,

I got your voicemail, but am on a conference call. Can you identify which products we're currently selling (either on our website or through a distributor) that are featuring the product and I can take a look? He mentioned it was a product on eBay, so I'm not sure when that would have been released since we don't have any involvement in the secondary market. If you can identify the piece(s) that we're currently using which you believe may involve his copyright, I'm happy to take a look.

Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

| Me | FYI | JUN 14 |
| DWIGHT | Nice | JUN 14 |

**Me to Brittany**                                                          JUN 14

Thanks, Brittany. I appreciate it. At this time, I see the following items which incorporate the image I sent you. There may be more, but this is from a quick search:

https://upperdeckstore.com/michael-jordan-1988-slam-dunk-backboard.html
https://upperdeckstore.com/michael-jordan-autographed-city-of-rings-photo-4589.html
https://upperdeckstore.com/michael-jordan-autographed-1988-slam-dunk-framed-photo-30-x-40.html
https://upperdeckstore.com/michael-jordan-autographed-1988-slam-dunk-photo.html

| Me | FYI | JUN 14 |

**Brittany to Me**                                                          JUN 15

Hi Eric,

To further our discussion from yesterday and to fully investigate your inquiry, it would be helpful if you could provide more information regarding your claims. To this end, please provide us with:

- The original copyright application showing the exact pictures covered by the registration;
- The copyright registration certificate;
- Sales agreements showing your ownership of the copyright registration; and
- Assignment agreements showing proper chain of title.

Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P  (760) 929-3021

E brittany_hysni@upperdeck.com

---

**Me to Brittany. Bcc: DWIGHT**                                                      JUN 15

Hi Brittany,

Thanks for responding so quickly. At this time, I'm only inquiring as to this image:



As I'm sure you're aware, my client has no obligation to provide any of the information you're
requesting at this time; the burden of proof is on UDC to prove a license for this image, not the other

way around, since UDC is not claiming an ownership interest. You can certainly seek that information in discovery if this proceeds that far, but I am of the sincerest hope that it's unnecessary.

I will represent to you that my client has full ownership of this image, assigned from Bill Smith, who is the original photographer. The sales agreement and assignment are, however, not for anyone's consumption. All litigation I'm currently preparing, for dozens of infringements, will of course aver ownership by Goatpix, LLC, under penalty of perjury, and will be accompanied by the copyright registration, which is all that's necessary to proceed in our district.

Nor am I obligated to provide either the copyright application or the certificate of registration. I can further represent that I'm confident enough in the chain of title to press my request to UDC to provide the licensing for this image. I am presently issuing DMCA takedown demands by the hundred in order to protect Dwight's rights. I have provided nothing in any of those other than what is statutorily required by DMCA.

I would most respectfully request that this be provided at UDC's earliest convenience. This should remain an amicable and civil process.

---

**Brittany to Me**                                                                                                   JUN 22

Hi Eric,

I have the team researching any use of the image. In the meantime, if you can please send  me the copyright registration and assignments filed with USPTO I would appreciate
it.

Thanks,
Brittany

**Brittany Hysni**
General Counsel

General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P (760) 929-3021
E brittany_hysni@upperdeck.com

---

**Me to Brittany. Bcc: DWIGHT**                                          JUN 22

Most respectfully, Brittany, the burden of proof does not belong to me, to Dwight, or to Goatpix. Please let me know what you learn about your licensing, this week.

   

---

**Me to Brittany**                                          JUL 15

Hi Brittany,

It's been a bit over three weeks. Following up to see what your team has learned. Neither Bill Smith nor Dwight have been able to locate any licensing to Upper Deck for this image, and we need to get this matter moving.

I still see items on the UD website for sale including a $7999 backboard using this image, a $6499 framed picture, a $7999 photo,  and a $6999 photo. That's $28,000 of infringements, without digging very deep.

As you know statutory penalties can run into the hundreds of thousands of dollars. We need to establish that a license exists for these products, or I need to advise my client on their options.

**Me to Brittany**                                                                JUL 16

Further to this, I see a lot of Upper Deck certified copies of this image on the secondary market. Unless we can establish that there was a license for these, I'm about to begin issuing DMCA takedowns to Etsy, eBay, and all of the secondary memorabilia marketplaces, and may need to begin opening litigation where appropriate. This is not going to reflect well on UD, and I suspect these purchasers will begin asking UD why the items they purchased were not legitimately licensed in the first place.

Brittany, I'm not trying to be difficult. If a license exists, please produce it. But I cannot sleep on my client's rights. I'm retained to vigorously enforce those rights, and I intend to do so by all legal means.

---

**Brittany to Me**                                                               JUL 19

Hi Eric,

I'm very surprised by your tone. As you can understand, I need to review your proof of authorization or copyright registration to confirm that you in fact have rights for this particular image. While I appreciate your representations, that is not sufficient. I've requested those documents multiple times, and have not received anything to date. I'm happy to have a follow-up discussion with you once I've received the documents.

Thanks,
Brittany

**Brittany Hysni**
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
P  (760) 929-3021
E  brittany_hysni@upperdeck.com

---

Me to Brittany. Bcc: DWIGHT                                    JUL 19

**PROTECTED SETTLEMENT DISCUSSION PURSUANT TO FRE §408
AND STATE EQUIVALENTS**

Brittany,

My tone has been patient since June 14, 2021; I'm surprised that you would be clutching pearls at this point.  I have asked, quite respectfully and kindly, over and over and over again, for proof that UD is licensed to sell my client's image. As you know quite well, the burden of proof is on UD in this case.

My client has no obligation to prove his ownership to anyone but the District Court; if you think you're going to get him to provide proof to you outside of a litigation context, you're wrong. That is not going to happen, I'm sorry.

However, UD is selling extremely expensive copies of my client's image. I've asked nicely, on multiple occasions for a license or some proof that UD is authorized to sell products with this image, and all I see by way of response is you deflecting.

I've been asking nicely for over a month at this point. If UD continues to deflect and not provide licensing to my client, I'm going to be forced into litigation. Obviously, I cannot open litigation in the

District court without providing proof of the registration along with our notice to the USCO. And my client's copyright registration as well as the relevant portions of his contract with the photographer, will be included in any complaint which becomes necessary to file. You will have ample opportunity to examine them at that time and in that context.

In other words, it's not you who needs to see my proof; that's backwards. It's me who needs to see your proof - and I need to see it immediately. My client has instructed me that close of business, Wednesday, July 21, 2021, is the deadline for UD to prove up a license. You have carefully made no representations to me whatsoever that UD even holds a license, while I, on the other hand, have specifically represented to you that my client owns not only the copyright, but all rights associated with this image.

It's become quite clear to me that UD holds no license for this image. If UD had a license, you would have provided it to me, because no prejudice accrues to your client for doing so. I would go away, and you would no longer be surprised by my attitude.

Brittany, I have an obligation to protect my client's rights. Because of the enormous respect I hold for UD, I have been holding back with UD while simultaneously issuing several hundred DMCA takedowns across the internet in the last month. Each of those takedowns was issued by me with a declaration sworn under penalty of perjury, as mandated by DMCA.

I have deliberately not issued takedowns of UD products, because I have given UD the benefit of the doubt out of that level of respect and out of respect for UD's stature in the industry. However, your reluctance to comply is speaking volumes.

If there was no license issued, my client is going to properly and understandably DMCA every resale of an UD product as an infringement, and those innocent purchasers are going to look to UD and ask what happened. We will also examine the liability of UD going backwards to the statutory maximum, and will seek to strike sales on a forward-looking basis, via injunction. In other words, the market for this specific Michael Jordan image is now closed, until and unless you show me that you have a right to be selling these images.

Please - make no mistake whatsoever - my job is to vigorously enforce my client's rights, and I would not be doing my job if I didn't press you on this issue.

If no license exists, my client is willing to work out an amicable settlement. This settlement could **_potentially_** include a waiver for all of the clients of UD who innocently purchased these infringing products; no one wants to upset the fans who paid good money for what they believed - in good faith - was an authorized copy of this image.

I will make one last representation to you, however - Dwight was very kind in his approach to you when this process began. His kindness and generosity of spirit are being eroded by every day that UD continues to delay coming to reckoning with this licensing issue.

I have absolutely zero desire to litigate this, or to begin shutting down secondary market resales of UD products. However, my client would be well within his rights to instruct me to engage in either or both of those actions. And - both of those actions are approaching at the speed of a freight train.

As of this writing, there are approximately two dozen secondary market sales on eBay of UD products which may infringe on my client's rights. Thursday morning, July 22, 2021,  if  I have not seen proof of licensing  or we are not engaged in meaningful settlement discussions, I'm going to issue a DMCA takedown to eBay for every one of the secondary market sales, to protect my client's intellectual property. Friday morning, July 23, 2021, I'm going to advise my client as to his litigation rights.

I could not have been more respectful to UD over the last month. And my respect has not been repaid in kind. How do we solve this, Brittany? What do you want me to do?

## Eric D. Ridley
### Attorney at Law

| | |
|---|---|
| 567 W. Channel Islands Blvd., Ste. 210 | 805.244.5291 |
| Port Hueneme, CA 93041 | 888.953.3884 fax |
| | ridley.eric@gmail.com |

July 22, 2021

Brittany Hysni
General Counsel
The Upper Deck Company
5830 El Camino Real
Carlsbad, CA 92008
Via Email: (Brittany_Hysni@upperdeck.com)

Ref:     Cease and Desist
         Goatpix, LLC

Dear Ms. Hysni:

As you know, this office represents Goatpix, LLC, who is the copyright owner of the photograph being infringed at (but not limited to):

*Upperdeckstore.com*
*https://upperdeckstore.com/michael-jordan-autographed-1988-slam-dunk-framed-photo-30-x-40.html*
*https://upperdeckstore.com/michael-jordan-1988-slam-dunk-backboard.html*
*https://upperdeckstore.com/michael-jordan-autographed-1988-slam-dunk-photo.html*
*https://upperdeckstore.com/michael-jordan-autographed-city-of-rings-photo-4589.html*

A copy of the infringed image ("the Work") is attached hereto for your reference.

It is my understanding that Upper Deck ("UD") has been selling high-priced copies of the Work for many years, both directly and through a large network of resellers; it would appear that UD has netted millions of dollars in revenue through this infringement.

I have been requesting, respectfully and amicably, since June 11, 2021, proof that UD holds a license to use this image in commerce. During a series of emails since June 11, your client has failed to produce any such license. This leads me to the inescapable conclusion that no such license exists, and that UD has been infringing on the work for quite some time.

This communication will therefore serve as formal demand that UD immediately cease the use, sale, resale, and distribution of all infringing works derived from the Work, and

---

all copies, including electronic as well as physical copies, of same, and that you deliver to my client, all unused, undistributed copies of same, and that you desist from this or any other infringement of my client's rights in the future. My client further demands that you recall all existing copies of the infringed works from your resellers and provide those copies to my client immediately.

In addition, please provide an accounting of all sales of your products derived from the Work since UD began selling these products. I will expect this accounting to be provided electronically to me no later than the close of business, Friday, July 29, 2021.

Finally, your client is instructed to contact all purchasers of any product derived from the Work, and instruct them that their purchase was an infringement, and to collect all of the infringing copies which you placed into the marketplace through sales and/or resales. Since each product was individually serialized, this should not create much of a challenge.

**This request is without prejudice as to any of my client's available rights under applicable law, including, but not limited to, litigation rights. All of my client's legal rights and remedies with respect to the Work are expressly reserved. My client is preparing litigation, and reserves all rights attendant to that litigation.**

Please also see attached, my client's demand for preservation of electronically stored information.


Very truly yours,

Eric D. Ridley

EDR:nsa
Attachments: 1

**ORIGINAL COPYRIGHTED IMAGE**



**Demand for Preservation of Electronically Stored Information**

Goatpix, LLC, hereby demands that you pre serve all documents, tangible things and electronically stored information potentially relevant to the issues in the pending litigation.

As used in this document, "you" and "your" refers to the Upper Deck Company, and their predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as:

- Digital communications (e.g., e-mail, voice mail, instant messaging);
- Word processed documents (e.g., Word or WordPerfect documents and drafts);
- Spreadsheets and tables (e.g., Excel worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., .WAV and .MP3 files);
- Video and Animation (e.g., .AVI and .MOV files);
- Databases;
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data;
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files.

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure that have been approved by the United States Supreme Court (eff. 12/1/06), you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible.

Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive the plaintiffs of their right to secure the evidence or the Court of its right to adjudicate the issue.

**Preservation Requires Immediate Intervention**

You must act immediately to preserve potentially relevant ESI including, without limitation, information with the earlier of a Created or Last Modified date on or after January 01, 2000 through the date of this demand and concerning:

1. The events and causes of action described in my demand letter;
2. All events and causes related to the image referenced in my demand letter;and
3. ESI you may use to support claims or defenses in the contemplated litigation;

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. Y**ou must also intervene to prevent loss** due to routine operations and employ proper techniques and protocols suited to protection of ESI.

Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI.

Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve document, tangible things and other potentially relevant evidence.

**Suspension of Routine Destruction**

**You are directed to immediately initiate a litigation hold** for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold.

You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI.

**Examples of such features and operations include:**

- Purging the contents of e-mail repositories by age, capacity or other criteria;
- Using data or media wiping, disposal, erasure or encryption utilities or devices;
- Overwriting, erasing, destroying or discarding back up media;
- Re-assigning, re-imaging or disposing of systems, servers, devices or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and,
- Executing drive or file defragmentation or compression programs.

**Guard Against Deletion**

You should anticipate that your employees, officers or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. Especially where company machines have been used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing and, in so doing, may also delete or destroy potentially relevant ESI.

This concern is not one unique to you or your employees and officers. It's simply an event that occurs with such regularity in electronic discovery efforts that any custodian of ESI and their counsel are obliged to anticipate and guard against its occurrence.

**Preservation by Imaging**

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like).

With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive.

Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, as well as each other person likely to have information pertaining to the instant action on their computer hard drive(s), demand is made that you immediately obtain, authenticate and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by that person during the period from January 01, 2000 to the date of this notice, as well as recording and preserving the system time and date of each such computer.

- All custodians of records, IT professionals, and/or Persons Most Knowledgable who are employed by, retained by, or who consult or otherwise perform freelance work for the Upper Deck Company, and their predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.
- All officers and board members of the Upper Deck Company, and their predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

**Preservation in Native Form**

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation.

You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible

**Metadata**

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access.

Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing.

Be advised that metadata may be overwritten or corrupted by careless handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

**Servers**

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved.

There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downed or must be online 24/7.

If you question whether the preservation method you pursue is one that we will accept as sufficient, please call to discuss it.

**Home Systems, Laptops, Online Accounts and Other ESI Venues**

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems may contain potentially relevant data.

To the extent that officers, board members or employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for

these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.).

Similarly, if employees, officers or board members used online or browser-based email accounts or services (such as Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

**Ancillary Preservation**

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI.

You must preserve any cabling, drivers and hardware, needed to access or interpret media on which ESI is stored.

**Paper Preservation of ESI is Inadequate**

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions.

If information exists in both electronic and paper forms, you should preserve both forms.

**Agents, Attorneys and Third Parties**

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

**System Sequestration or Forensically Sound Imaging**

We suggest that, with respect to All custodians of records, IT professionals, and/or Persons Most Knowledgable who are employed by, retained by, or who consult or otherwise perform freelance work for the Upper Deck Company, and their predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions. , removing their ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation step.

In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective.

As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods.

Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," we mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original.

A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including in the so-called "unallocated clusters," holding deleted files.

**Preservation Protocols**

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol, if you will furnish an inventory of the systems and media to be preserved.

Else, if you will promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them.

A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective experts

can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to the Court.

**Do Not Delay Preservation**

I'm available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay.

Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

**Confirmation of Compliance**

Please confirm by July 30, 2021, that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

# NICHOLAS & TOMASEVIC LLP

### ATTORNEYS AT LAW

Tel: 619-325-0492                                                                 225 Broadway, 19th Floor
Fax: 619-325-0496                                                                  San Diego, CA 92101

August 3, 2021

**VIA U.S. MAIL and E-MAIL**

Eric D. Ridley
567 W. Channel Islands Blvd., Ste. 210
Port Hueneme, CA 93041
Email: ridley.eric@gmail.com

**Re:    Goatpix, LLC v. The Upper Deck Company**

Dear Mr. Ridley,

        We represent The Upper Deck Company ("Upper Deck"). Allow this correspondence to serve as a response to your cease and desist letter and demand for preservation of electronically stored information dated July 22, 2021. Your cease and desist letter alleges Upper Deck infringed on Goatpix, LLC's ("Goatpix") copyrighted image of Michael Jordan (the "Image"), yet fails to include sufficient evidence for Upper Deck to evaluate this claim, despite Upper Deck's repeated requests for such documents.

        As you know, Goatpix has the burden to establish the existence of a valid copyright, ownership of such copyright, and Upper Deck's infringement of the copyright. You letter fails to include an authorization from the supposed rights holder as well as copies of the copyright application and registration and thus, Upper Deck is unable to substantiate Goatpix's claims. Until Upper Deck receives evidence of Goatpix's valid copyright application and registration for the Image, it is under no obligation to cease and desist the use, sale, resale and distribution of works derived from the Image.

        Furthermore, your client has unlawfully sold products using the Image, which directly interferes with Upper Deck's exclusive rights to sell Michael Jordan memorabilia. Upper Deck reserves its affirmative claims for unauthorized sale of memorabilia in violation of its rights.

        Please also preserve all records and evidence relating to your use of the Image. Nothing in this letter is intended or shall be construed to constitute an express or implied waiver of any rights or remedies that Upper Deck may possess in connection with this matter, all of which are hereby expressly reserved. In addition, the letter is not intended to be a complete recitation of the facts

Eric D. Ridley
August 3, 2021
Page 2
_____

upon which this matter is based. We look forward to your prompt response in an effort to resolve
this issue short of litigation.

Sincerely,
**NICHOLAS & TOMASEVIC, LLP**

Craig Nicholas

cc: Brittany Hysni